**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AIG SPECIALTY INSURANCE COMPANY,** | ) | **CASE NO. 1:22CV361** |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **SITE CENTERS CORPORATION,** | ) | <u>**OPINION AND ORDER**</u> |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**CHRISTOPHER A. BOYKO, J.:**</u>

This matter comes before the Court upon the Renewed Motion (SEALED ECF DKT #70

& REDACTED ECF DKT #71) of Plaintiff AIG Specialty Insurance Company ("AIG") for

Summary Judgment.  For the reasons that follow, the Motion is denied.

## I. BACKGROUND

Twenty-five years ago, Defendant SITE Centers Corporation ("SITE"), formerly known

as DDR Corporation, constructed a parking lot at the Stow Community Shopping Center in Stow,

Ohio.  The parking lot was constructed using steel mill slag as a subbase.  The Ohio EPA

("OEPA") issued a Notice of Violation ("NOV") to SITE that stormwater runoff from the

parking lot that migrated through the slag subbase was causing pollutants to invade the waters of

the State of Ohio.  Ultimately, in response to the NOV, SITE removed and replaced a portion of

the parking lot including the slag subbase.  SITE seeks to recover its costs for removal under a

Pollution Liability Insurance Policy ("Policy") with its insurer, AIG.

AIG issued to SITE a Pollution Legal Liability Real Estate Policy (CRE 25417764)

effective from December 31, 2014 to December 31, 2017.  The parking lot at issue is owned by SITE.  On or about March 21, 2016, after a rain, stormwater with a pH of greater than 12.5 was released from the property's stormwater management system and flowed into a tributary of Fish Creek.  The OEPA issued an NOV to SITE for violations of Ohio Revised Code ("O.R.C.") Sections 6111 and 3734 due to discharge into waters of the State of Ohio, which created a buildup of flocculate (clumps) in the drainage ditch flowing into Fish Creek.  The NOV instructed SITE to take initial abatement actions including:  "Determine the source of the D002 waste and work to eliminate the **generation** of the waste."  (Emphasis added).

The OEPA ordered SITE to stop discharging polluted stormwater into the waters of the State of Ohio and to clean the drainage ditch.  SITE hired ATC Group Services to investigate. ATC installed a plug to hold water in a pond so it could be treated prior to discharge into the drainage pipe.  ATC's scientific investigation, testing and borings determined that the likely source of contamination was the slag used as a subbase material for the parking lot.  SITE set up a temporary stormwater treatment system while it explored ways to prevent further discharges into the waters of Ohio.

On March 22, 2016, SITE informed AIG of the violations and demanded coverage under the policy.  AIG ultimately paid $479,286.56 for the remediation of discharge contaminants in the drainage ditch and waters of the State of Ohio and to treat contaminated water until clean-up was complete.  However, AIG has refused coverage for SITE's ultimate removal of the slag and replacement of the parking lot.

On March 4, 2022, AIG filed the within Declaratory Judgment action seeking a judicial declaration that there is no coverage under the Policy and that AIG has no obligation to pay sums

to SITE for Clean-Up Costs.  SITE has filed a Counterclaim for Breach of Insurance Contract and Declaratory Judgment that AIG is liable to cover all costs for Clean-Up.  Those costs exceed the Policy Limits of $3,000,000.

On May 23, 2025, AIG filed its Renewed Motion for Summary Judgment requesting the Court to declare that AIG has no coverage obligation to SITE.  AIG asks the Court to find that there is no coverage because the Clean-Up Costs:  (1) did not result from a Pollution Condition (instead, they are prophylactic); (2) are not reasonable and necessary, in that there is a far more cost-efficient way to address the slag leachate; (3) are not required by Environmental Laws; (4) were incurred without AIG's consent in violation of the Policy's "voluntary payments" condition; (5) are precluded from coverage by Exclusion I because the alleged Pollution Condition existed prior to the Policy's Inception Date and was known to SITE but not disclosed to AIG; and (6) allegedly result from a Pollution Condition that began long before the Policy's 2014 Continuity Date.

The Court will address each specific reason in turn.  However, the Court is compelled first to address AIG's request for reconsideration (ECF DKT #70 at 17-18) of the *Daubert* ruling of March 28, 2025.  After briefing and an oral hearing, the Court denied AIG's Motion to Exclude the report and testimony of SITE's expert, Michael J. Connolly.  (ECF DKT #64). Relying upon the reasons detailed in the original Motion to Exclude, AIG insists again that Connolly is not qualified to offer reliable and relevant opinions.  Aside from the tardiness of this request, AIG makes the same arguments that were found unpersuasive before and inappropriately inserts them within its Renewed Motion for Summary Judgment.

"District courts have authority both under common law and Rule 54(b) to reconsider

interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F.App'x 949, 959 (6th Cir. 2004). Nevertheless, motions for reconsideration "serve a limited purpose and should be granted for one of three reasons: (1) because of an intervening change in controlling law; (2) because evidence not previously available has become available; or (3) because it is necessary to correct a clear error of law or preventing manifest injustice." *Boler Co. v. Watson & Chalin Mfg. Inc.*, 372 F.Supp.2d 1013, 1024-25 (N.D.Ohio 2004), quoting *General Truck Drivers, Local No. 957 v. Dayton Newspapers, Inc.*, 190 F.3d 434, 445 (6th Cir. 1999) (Clay, J. dissenting), *cert. denied*, 528 U.S. 1137 (2000). AIG establishes none of those justifications; and the Court declines to reconsider its *Daubert* ruling regarding SITE's expert.

## II. LAW AND ANALYSIS

### Standard of Review

Summary judgment shall be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed.R.Civ.P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy. Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *See* Fed.R.Civ.P. 56(c)(1)(A), (B). A court considering a motion for summary judgment must view

the facts and all inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim.  *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

This Court does not have the responsibility to search the record *sua sponte* for genuine issues of material fact.  *Betkerur v. Aultman Hospital Ass 'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404-06 (6th Cir. 1992).  The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); and if the nonmoving party fails to make the necessary showing on an element upon which it has the burden of proof, the moving party is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.  Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Amway Distributors Benefits Ass 'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

**Relevant Policy Provisions**

**COVERAGE A - ON-SITE CLEAN-UP OF POLLUTION CONDITIONS**

To pay on behalf of the Insured, **Clean-Up Costs resulting from Pollution Conditions** on or under the Insured Property **if such Pollution Conditions are discovered by the Insured during the Policy Period**, provided:

1. The discovery of such Pollution Conditions is reported to the Company in writing as

soon as possible after discovery by the Insured and in any event during the Policy Period in accordance with Section III. of the Policy.  Discovery of Pollution Conditions happens when a **Responsible Insured** becomes aware of Pollution Conditions.

2. Where required, such Pollution Conditions have been reported to the appropriate governmental agency in substantial compliance with applicable Environmental Laws in effect as of the date of discovery.

---

**EXCLUSIONS**.

**I.  PRIOR KNOWLEDGE/NON-DISCLOSURE**:

This insurance does not apply to Clean Up Costs, Claims or Loss:  arising from **Pollution Conditions** existing prior to the **Inception Date** and known by a **Responsible Insured** and not disclosed in the application for this Policy, or any previous policy for which this Policy is a renewal thereof.

---

**INCEPTION DATE: December 31, 2014**

---

**ENDORSEMENT No. 7** (ECF DKT#1-1 at 31):

Solely with respect to **Pollution Conditions** that commenced prior to the **Continuity Date** shown below, it is hereby agreed that Section I. INSURING AGREEMENTS. A. COVERAGES, COVERAGE A - ON-SITE CLEAN-UP OF POLLUTION CONDITIONS and COVERAGE C - EMERGENCY RESPONSE COSTS are deleted in their entirety.

**Continuity Date: Inception Date 12/31/14**

-6-

CONDITIONS.

**E.  Voluntary Payments** - No Insured shall voluntarily enter into any settlement, or make any payment or assume any obligation unless in response to an emergency or pursuant to Environmental Laws that require immediate remediation of Pollution Conditions, without the Company's consent which shall not be unreasonably withheld, except at the Insured's own cost.

---

DEFINITIONS.

**C**. **Clean-Up Costs** means **reasonable and necessary expenses**, including legal expenses **incurred with the Company's written consent which consent shall not be unreasonably withheld or delayed**, for the **investigation, removal, remediation including associated monitoring, or disposal of soil, surfacewater, groundwater or other contamination:**

1. **To the extent required by Environmental Laws**; or

2. That have been actually incurred by the government or any political subdivision of the United States of America or any state thereof or Canada or any province thereof, or by third parties.  Clean-Up Costs also include Restoration Costs.

**D**. **Environmental Laws** means any federal, state, provincial or local laws (including, but not limited to, statutes, rules, regulations, ordinances, guidance documents, and **governmental, judicial or administrative orders and directives) that are applicable to Pollution Conditions**.

**N**. **Pollution Conditions** means the discharge, dispersal, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant including, but not limited to, smoke, vapors,

soot fumes, acids, alkalis, toxic chemicals, medical waste and waste materials into or upon land, or any structure on land, the atmosphere or any watercourse or body of water, including groundwater, provided such conditions are not naturally present in the environment in the amounts or concentrations discovered.

**Q**. **Responsible Insured** means the manager or supervisor of the Named Insured responsible for environmental affairs, control or compliance. or any manager of the Insured Property, or any officer, director or partner of the Named Insured.

---

**DFFO**

As used in the parties' briefing, **DFFO** means the OEPA Director's Final Findings and Orders issued on February 3, 2017 (ECF DKT #71-17), which recite in part:

Item #3.  Slag is producing leachate discharge to the shopping center stormwater management system.

Item #4.  Beginning on March 21, 2016, leachate was observed to be discharging from the stormwater retention basin adjacent to the parking lot.

Item #5.  The combined stormwater with slag-based leachate contains Total Dissolved Solids (TDS), Total Suspended Solids (TSS), and high pH.  The level of TDS and pH being discharged meet water quality standards after treatment.

Item #9.  Respondent's coverage under the temporary discharge permit has expired and cannot be renewed.  Until such time as an individual permit has been obtained or the discharge is lawfully eliminated, compliance with these Orders is intended to manage the discharge to protect public health and the environment.

-8-

**Contract Interpretation**

AIG's Complaint was brought in federal court under diversity jurisdiction.  Therefore, the substantive law of Ohio applies; and the district court must look for guidance to the decisions of the Ohio Supreme Court.  *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013).  If the Ohio Supreme Court has not spoken on an issue, then the district court turns to the decisions of the lower courts, to the extent they are persuasive, to predict how the Ohio Supreme Court would decide the issue.  *Id.*; *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985).

The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties.  *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (1989).  "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement."  *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus.

"In insurance policies, as in other contracts, words and phrases are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the contract."  *Williams-Diggins v. Permanent General Assurance Corporation of Ohio*, No. 108846, 2020 WL 4516931, *2 (Ohio Ct. App., 8th Dist. Aug.6, 2020) (citing *Beverage Holdings, LLC v. 5701 Lombardo, LLC*, 159 Ohio St.3d 194, 197 (2019)).

A court should read and consider the contractual provisions as a whole and not in isolation.  *Foster Wheeler Enviresponse v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (1997).  "Courts should not interpret contracts in a way that renders at least one clause superfluous or meaningless."  *Transtar Elec. Inc. v. A.E.M. Elec. Servs. Corp.*, 140

Ohio St.3d 193, 2014-Ohio-3095, ¶ 26 (2014).

The absence of definitions does not necessarily make terms ambiguous. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995). Ambiguity exists when a term is subject to more than one reasonable interpretation. *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988); *Buckeye Union Ins. Co. v. Price*, 313 N.E.2d 844, 846 (Ohio 1974). Ambiguous provisions in an insurance policy "will be construed strictly against the insurer and liberally in favor of the insured." *King*, 519 N.E.2d at 1383. However, courts cannot create ambiguity if none exists. *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008); *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978).

AIG argues that it is entitled to summary judgment declaring that the Pollution Legal Liability Policy issued to SITE does not cover SITE's voluntary installation of a new parking lot at its aging commercial property in Stow, Ohio. In opposition, SITE contends that considering the sum of the Policy's terms and definitions, its Clean-Up Costs were reasonable and necessary for the removal and remediation of the contamination to the extent required by Environmental Laws (in this case, "administrative orders and directives").

(1). "Resulting From"

AIG's first argument is that preventing future releases is not a cost "resulting from" a Pollution Condition as required under Coverage A of the Policy. AIG already paid the costs for the March 2016 release from SITE's facility stormwater management system. AIG cites to *Bellaire Corp. v. Am. Empire Surplus Lines Ins. Co.*, 115 N.E.3d 805, 811, 2018-Ohio-2517 (Ohio Ct.App., 8th Dist., 2018); and that opinion reads in part:

Furthermore, costs incurred to prevent future harm are generally not covered by

-10-

insurance.  Courts have held that prophylactic costs incurred to prevent future harm are "not caused by the happening of an accident, event, or repeated exposure to conditions but rather result from the prevention of such an occurrence." *Cinergy Corp. v. Assoc. Elec. & Gas Ins. Servs. Ltd.*, 865 N.E.2d 571, 583 (Ind.2007); see also *Evansville v. United States Fid. & Guar. Co.*, 965 N.E.2d 92, 101 (Ind.App.2012).

Consequently, AIG argues that there is no coverage for preventing *future* Clean-Up costs from *future* releases.  There is no coverage for prophylactic measures.  SITE is seeking costs to prevent a potential future discharge, rather than to remediate a past release.

In opposition, SITE says that the claimed expenses are not prophylactic, but rather a response to an unexpected "release" of a contaminant that will continue absent long-term remediation.  SITE insists that the costs it seeks are caused by the Pollution Condition and are necessary to comply with OEPA orders and directives.  Per the DFFO, compliance with Orders of the OEPA continue until an individual permit is obtained by SITE or the discharge is lawfully eliminated.  (DFFO, ECF DKT #71-17 at Item #9).

Neither party contends that the Policy term, "resulting from," is ambiguous.  Therefore, interpretation by the Court is not necessary.  The words of the Policy shall have their plain and ordinary meaning.  A jury will have to determine whether SITE's costs were incurred to prevent future harm from a future event or were caused by the original Pollution Condition continuing to exist on the insured property.

(2).  "Reasonable and Necessary Expenses"

AIG next argues that SITE's construction costs are not Clean-Up Costs as defined by the Policy.  The costs were not "reasonable and necessary" since a more cost-effective alternative was available.  According to AIG's expert, Brian W. Tornes:

-11-

"A new underdrain system that would funnel only the leachate into a holding tank that adjusts the water's pH to bring it into allowable limits before discharge, would have alleviated the cost of treating the 90% or so of stormwater that does not touch the slag."  (ECF DKT #71-19, Tornes Depo. at 117:10-118:23).  And, "[t]his system's approximate cost was $450,000, substantially less than the more than $2 million that SITE has spent replacing its parking lot while it continues "temporary" stormwater treatment for millions more."  (ECF DKT #71-3, Tornes Report at 4, 10; #71-2, Joseph Chura Depo. at 107:8-12.).

AIG also insists that SITE was not required to remove the slag; rather only to prevent discharge of high pH water to the waters of the state of Ohio.  The parking lot replacement was, therefore, not necessary.

SITE counters that the OEPA directed SITE away from the cheaper option, *i.e.*, long-term pumping and treating, and towards removal of the slag beneath the parking lot.  William Fischbein, who is designated as 30(b)(6) witness on behalf of OEPA, testified:

Q.· ·Was -- was any other option besides slag removal ever approved by the Ohio EPA?

A.· ·No.· Not that I recall.

(#71-21, Fischbein Depo. at 59:18-20).

Moreover, reasonableness is generally considered a fact issue.  "Reasonable and necessary," even if equated with "most cost-effective" as AIG insists, is a factual determination for the jury.  For example, AIG cites to *Goodrich Corp. v. Comm. Union Ins. Co.*, 2008 WL 2581579 at *17 (Ohio App. June 30, 2008) which significantly was an affirmance of a jury verdict in part.  (" [T]he defendant insurers vigorously disputed whether many of those costs were reasonable and/or necessary to the remediation efforts at the Calvert City site. The insurers focused on many facts that could have led the jurors to reduce Goodrich's damages."· . . ."There was evidence before the jury to dispute whether the methods chosen by Goodrich to clean the

groundwater were the most cost effective,. . .)

Furthermore, it will be the province of the jury to consider the credibility of SITE's

expert's opinion as to reasonable and necessary costs.  (Connolly Report, ECF DKT #76-18 at 9):

> ATC's interim pump-and-treat solution was necessary and reasonable to enable
> SITE to temporarily abate the pollution condition while it performed the necessary
> investigation and testing to identify a permanent solution. But it did not resolve
> the difficult requirement specified in NOV No. 5—"eliminate the generation of
> the waste"—which required SITE to isolate the pollutant and stop it from mixing
> with stormwater. The pump-and-treat system has operated continuously under
> various discharge permits for almost seven years; and it will need to continue
> operating until SITE demonstrates to OEPA that a permanent solution that
> independently eliminates high pH discharges to the waters of Ohio is in place,
> pursuant to the DFFO.

> Further at ECF DKT #76-18 at 10:

> On June 2, 2017, SITE again met with the OEPA. . . .  During that meeting, the
> OEPA's attorneys, Bill Fischbein and Casey Galligan, informed SITE that they
> spoke to the Director of the OEPA, Craig Butler, who explained that he preferred
> not to issue SITE an individual NPDES permit allowing long-term discharge into
> the waters of Ohio and that SITE should continue to discharge under the DFFO. . .
> . They also informed SITE that Director Butler requested that SITE remove the
> slag within one year, and that the OEPA did not consider longterm treatment a
> viable permanent solution because slag causes variable pH and total dissolved
> solids ("TDS") issues that would continue until the slag was removed. (*Id.*).

(3).  "Environmental Laws"

AIG additionally argues that SITE's construction costs are not Clean-Up Costs because

they were not required by "Environmental Laws."  No Environmental Law required removal and

replacement of the slag.  SITE actually accomplished cleaning the ditch and preventing

discharges into the waters of the Ohio in 2016.  In support of its position, AIG points to

testimony of OEPA witnesses showing that the OEPA issued no order requiring slag removal.

(*e.g.*, ECF DKT #71-20, Fischbein Depo. at 70:23-71:1 - no order to dig up parking lot).

In response, SITE first points out that in his testimony, Fischbein further discussed the difference between a condition addressed by the emergency division of the OEPA and a condition addressed subsequently by the surface water division of the OEPA.  And as the OEPA 30(b)(6) witness Kurt Kollar emphasized:  At the emergency phase, " it was still unknown what the exact cause or nature of the material causing the problem was;" "our recommendations at this time did not call for removal;" and " this case was referred to our division of surface water." (ECF DKT #71-4, Kollar Depo., 26:11-23).

As defined in the Policy, Environmental Laws include "administrative orders and directives that are applicable to Pollution Conditions."  SITE notes that Fischbein also testified that SITE was told by the OEPA to pursue a remedy involving removal of slag:  "I think we -- we got some – obviously, some **direction** from the top to pursue the remedy that involved the removal of the --of the slag.  It took longer than the Director's preference of a year, but, you know, it ultimately -- it ultimately resolved itself."  (Emphasis added).  (ECF DKT #71-20, Fischbein Depo. at 72:14-20).

Further in the Connolly Report, ECF DKT #76-18 at 13**:**

> **The Director has the ultimate authority and full support of the agency, including his legal staff, and when they informed SITE that the Director preferred a certain remedy—slag removal—SITE would have needed an exceedingly compelling basis to treat that information as anything other than a *binding directive*. No such compelling basis existed.**  (Emphasis added).

These disputed facts regarding "orders and directives" of the OEPA militate against declaring that AIG owes no coverage for Clean-Up Costs.

(4).  "Voluntary Payments"

AIG next asserts that the Voluntary Payments provision of the Policy requires that SITE

obtain AIG's consent before incurring obligations for which it will seek coverage.  Therefore, SITE's proceeding with slag removal without AIG's approval was at its own cost.

AIG contends that SITE "not only failed to get ASIC's consent, but rebuffed its efforts to be involved in the process."  (ECF DKT #70 at 24).

In 2021, AIG responded by letter to SITE's stated intention to begin excavating and removing slag.  AIG advised that SITE had not provided the requested explanation or information to support the necessity of further Clean-Up Costs and that replacement of the parking lot would be solely at SITE's expense.  AIG stated that it had paid all covered amounts and owed no further coverage obligation.  (ECF DKT #71-16).

AIG insists that throughout 2020, SITE never even contacted AIG and then "suddenly advised" in March of 2021 that it was going forward with imminent removal of a part of the slag.  (ECF DKT #70 at 25).  Thus, AIG had no opportunity to give consent to partial slag removal.  Moreover, in its Reply Brief, AIG emphasizes that it is undisputed that it reasonably withheld consent to full slag removal and was not given an opportunity to consider informed consent to partial slag removal.  Thus, SITE incurred the costs voluntarily.  (ECF DKT #80 at 23).

AIG additionally argues that SITE "admits it was reasonable for ASIC to withhold consent."  However, SITE offers contravening evidence through the deposition of SITE's 30(b)(6) witness, Joseph Chura.  SITE acknowledges that it was not unreasonable for AIG to refuse to pay for removal of the *whole* parking lot *when only a part was in fact removed.*  See, #71-2, 103:5-15:

A.· ·Yeah.· I'm trying to remember if

there's a distinction between what we own and

-15-

what we don't own, but I think it was a quarter

of the site; a third of what we own.

Q.· ·Okay.· At a -- at a much lower cost

than it would have been to remove all the slag,

correct?

A.· ·Correct.

Q.· ·Okay.· So DDR does not contend, does

it, that AIG Specialty unreasonably refused to

pay for the entire slag removal, does it?

Continuing at ECF DKT #71-2, 104:1-13:

A.· ·Absent the further dialogue with EPA,

no, that was not unreasonable.

Q.· ·What do you mean by absent the further

dialogue with the OEPA?

A.· ·It was -- it was further conversations

with EPA where the idea of remediating a portion

of the slag -- actually, I think that's where

that -- in EPA's conversations, there were --

there was conversation about doing it in phases,

and I think that may have been the precursor to

the -- to where we are today, which was only

doing a small portion -- a smaller portion of the parking lot.

-16-

For its part, SITE asserts that it sought AIG's consent to slag removal at least six times between October 11, 2016 and March 17, 2020, without success.  (See ECF DKT #71-24, ECF DKT #71-15, ECF DKT #70-14.).  Moreover, SITE's counsel provided opposing counsel a summary in April of 2021, of SITE's activities regarding the parking lot remediation; and noted specifically that:  "During 2020, activities at the Site, except for required and sampling events (stormwater and pond sediment) and maintenance of the leachate collection system, were mostly suspended because of the COVID-19 epidemic."  (ECF DKT #76-7 at 4).  Thus, SITE provides an explanation why there may have been no contact with AIG during 2020.

AIG's contention that it was not given the opportunity to consider consent to partial removal of the slag is belied by a March 17, 2020 communication from SITE's counsel to AIG's counsel.  (ECF DKT #70-14).  In pertinent part, that letter reads:

- "The temporary onsite water treatment system was never expected to be sustainable and was meant only as a interim measure until a long-term solution could be found."

- SITE "engaged Apex Companies, LLC (Apex) to investigate and evaluate the issues at the Site and identify a more cost-effective long-term solution."

- "Apex's investigation has shown that the slag sub-base is in poor condition, and the slag will continue to cause leachate issues into the storm water conveyances."

- "SITE Centers and Apex have prepared remedial design work on a lesser scale than originally expected to replace only a portion of the parking lot."

- "This solution is expected to be far more cost effective than previously thought, as it is more focused and will require removing and replacing only about one-third of the parking lot and storm system."

-17-

- "We hope that this work will resolve the contamination problem at the Site and permit Ohio EPA to terminate the outstanding DFFO from February 2017."

- "We reiterate, per our prior correspondence that the reasonable cost of remediating the Site in an environmentally responsible, long-term fashion, as required by the Ohio EPA, is covered loss under the policy, and our expectation is that AIG will fund this solution, pursuant to the terms of the policy."

Since there was no change in AIG's position on coverage, SITE ultimately made plans to remove the slag on its own in February 2021.

The Court finds that there are issues of fact whether it was reasonable for SITE to implement the OEPA's preferred remedy for the Pollution Condition and whether AIG's consent to cover the costs of partial slag removal was unreasonably withheld.

(5). "Exclusion I"

AIG contends that Exclusion I precludes coverage because SITE was aware of the slag leachate before the Inception Date (December 31, 2014), but failed to disclose it to AIG. According to Exclusion I in the Policy:  "This insurance does not apply to Clean Up Costs, Claims or Loss arising from Pollution Conditions existing prior to the Inception Date and known by a Responsible Insured and not disclosed in the application for this Policy."  Per Policy Definition Q:  **"**Responsible Insured means the manager or supervisor of the Named Insured responsible for environmental affairs, control or compliance, or any manager of the Insured Property, or any officer, director or partner of the Named Insured."

As early as 1996, consultants and contractors informed Norm Elbin (SITE's project coordinator at the time) that the pavement was "cracking and rutting" and "seepage of water up

-18-

from the base material and through the cracks in the pavement was observed."  (ECF DKT #70-3 at 36).  In 1997, contractors informed SITE that "white staining" on the parking lot indicated "poor drainage of the base."  AIG asserts that SITE's expert concedes that water was moving through the slag prior to March of 2016.  (ECF DKT #71-37, Connolly Depo. at 152:20-153:12). AIG concludes that a "Responsible Insured" knew of Pollution Conditions existing before the Inception Date but did not disclose it in its application with AIG.

For its part, SITE believes that the consultants and contractors informed Elbin about "moisture in the subbase migrating up through the pavement."  (Chura Depo., ECF DKT #71-2, 42:20-22).  Under questioning, Chura further surmised what the source of the white staining was:

> Q.· ·And as that water came up, did it
>
> contain materials from the slag that would cause
>
> it to give white staining?

At p. 43:

> A.· ·No.· The source of the staining wasn't known.

(*Id*., 42:23-25, 43:1-2).

SITE's counter-argument is that SITE may have been aware of leaching, not leachate. As SITE's 30(b)(6) witness, Chura testifies and distinguishes those terms in his deposition testimony at ECF DKT #71-2, 45:21-23 and 46:4-8:

> A.· ·No.· We were not aware of leachate.· We
>
> were aware of leaching, which I would surmise
>
> was moisture on the surface.

Chura further testifies:

A.· ·Leaching is the process of water or a

liquid moving through and being -- moving

through something else, and leachate can be the

product of that leaching where the water picks

up something and deposits it somewhere else.

SITE's expert, Michael Connolly, offers his opinion on "white staining" and what was

known.  (ECF DKT #76-18, p. 40, fn. 24):

> ... In any event, SITE itself would not have possessed the requisite geochemical
> expertise to identify it as such, and none of the pertinent documents prepared by
> SITE's engineering consultants or any third parties ever did so. This is perhaps
> unsurprising, since once cracked, the asphalt could have allowed any numbers of
> solids to enter the underlying base materials such as road salt, well-water salt
> pellets, mortar sands, concrete dust, gypsum wall-board fragments, fertilizers,
> flour, thickeners, etc. that are commonly found or spilled on parking lot surfaces.
> Certain of these may also return to the asphalt surface during localized ponding,
> such as road salts leaving a white powder residue after drying, similar to the visual
> effect after calcium chloride salts are sprayed on the road surface prior to winter
> snow events.

Also, per Connolly's deposition testimony (ECF DKT #76-19 at 45:20-24**)**:

**A**. Yes.  Based on review of all these

documents that I reviewed, hundreds or thousands of

documents, I don't see any evidence that -- that

anybody was aware of a pollution condition prior to March 21, 2016.

Therefore, the evidence is in dispute whether SITE (by a Responsible Insured) knew of a

Pollution Condition (irritant or contaminant) in levels not found naturally in the environment in

the defined amounts and levels prior to the Inception Date and failed to disclose it to the insurer.

The definition of Pollution Condition will likely require expert testimony regarding

specific terminology; and the point in time when it was observed or known will be a subject for party witness testimony.  There are factual disputes because SITE's witness, Joseph Chura, and SITE's expert, Michael Connolly, testify that there is a distinction between leaching and leachate; and that leachate with a high pH level is the relevant Pollution Condition.  There is a genuine dispute whether the Pollution Condition existed, was known by a Responsible Insured prior to the Inception Date and was not disclosed in the application for coverage.

(5).  "Endorsement 7"

Lastly, AIG asserts that Coverage A is unavailable because the leaching began before the Continuity Date (December 31, 2014).  Endorsement 7 deletes coverage for Pollution Conditions commencing before the Continuity Date.

AIG claims that SITE observed leaching starting in 1996.  The buildup in the water system, catch basins and outfalls would have taken an extended amount of time according to SITE's own consultant, ATC.

On SITE's behalf, Connolly's testimony is that no one knows how long ago the Pollution Condition commenced.  " I don't know. I mean, I think you are asking how long it took, and I don't know how long.  I don't know.  I just know that on March 21st, there was a pollution condition."  (ECF DKT #76-19, 43:10-13).

AIG's expert cannot say when a "pollution condition" began. (Tornes Depo, #71-19, 183: 5-19):

A.  I guess I would -- I wouldn't use the term,

pollution condition, or, the scenario. I would just

say we were generating high pH water from whatever the - -

-21-

- - as soon as the slag was laid down. The first time

rain precipitated on that slag, even before --

presumably, it would have rained at some point before

they had the entire surface covered by asphalt. When

that occurred, we would have had some water being

collected that had an elevated pH.

Q. But you don't have any data on that, correct?

A. Correct.

Q. Nobody was testing that, correct?

A. Nobody was testing for pH at that time, to

my knowledge.

At 184:1-4 (emphasis added):

Q. So, it is impossible to say for certain

when high pH water entered the waters of the state?

A. When it occurred, correct. **When it**

**started, correct.**

Neither expert can say definitively when the Pollution Condition commenced.  A jury can

choose to find one or neither expert witness to be credible.  In any event, with the disputed state

of the evidence, it is not appropriate for the Court to declare that there is no coverage owed by

AIG based upon Endorsement 7.

## III. CONCLUSION

Viewing the facts and all inferences in the light most favorable to Defendant SITE Centers Corporation, the Renewed Motion (SEALED ECF DKT #70 & REDACTED ECF DKT #71) of Plaintiff AIG Specialty Insurance Company for Summary Judgment is denied.  Genuine issues of material fact preclude the Court from granting summary judgment in favor of AIG and declaring that there is no coverage owed under the applicable Pollution Legal Liability Real Estate Policy.

**IT IS SO ORDERED.**

**DATE: October 24, 2025**

<u>**s/Christopher A. Boyko**</u>
**CHRISTOPHER A. BOYKO**
**United States District Judge**